**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARC MENZIONE, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | |
| | **CLASS ACTION COMPLAINT** |
| v. | |
| | **JURY TRIAL DEMANDED** |
| YEXT, INC., HOWARD LERMAN, and STEVEN CAKEBREAD, | |
| Defendants. | |

Plaintiff Marc Menzione ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Yext, Inc. ("Yext" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Yext securities between March 4, 2021 and March 8, 2022, both dates inclusive (the "Class Period"), seeking to recover

damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Yext organizes a business's facts to provide answers to consumer questions online. The Company operates Yext platform, a cloud-based platform that allows its customers to, among other things, provide answers to consumer questions, control facts about their businesses and the content of their landing pages, and manage their consumer reviews.  Yext's website describes its service as "a modern, AI-powered Answers Platform that understands natural language so that when people ask questions about a business online they get direct answers—not links."

3.      As COVID-19 resurged throughout 2021, Yext consistently assured investors that pandemic-related impacts on the Company's business were limited as the Company adapted to lockdowns and improved efficiencies in its sales and other operations.

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Yext's revenue and earnings were significantly deteriorating because of, *inter alia*, poor sales execution and performance, as well as COVID-19 related disruptions; (ii) accordingly, Yext was unlikely to meet consensus estimates for its full year ("FY")  fiscal 2022 financial results and fiscal 2023 outlook; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.      On March 8, 2022, Yext issued a press release announcing its fourth quarter ("Q4") and FY fiscal 2022 results.  Among other items, Yext reported Q4 fiscal 2022 revenue of $100.9 million, falling short of consensus estimates by $140,000; first quarter ("Q1") fiscal 2023 revenue

outlook of $96.3 million to $97.3 million, versus consensus estimates of $103.79 million; Q1 fiscal 2023 non-GAAP net loss per share outlook of $0.08 to $0.07, versus consensus estimates of $0.05; FY fiscal 2023 revenue outlook of $403.3 million to $407.3 million, versus consensus estimates of $444.71 million; and FY fiscal 2023 non-GAAP net loss per share outlook of $0.19 to $0.17, versus consensus estimates of $0.09.  The Company further disclosed the departure of its CEO and CFO.

6.     That same day, on a conference call to discuss Yext's Q4 and FY fiscal 2022 results, the Company's incoming CEO, Michael Walrath ("Walrath"), addressed the Company's disappointing financial results, revealing, *inter alia*, that "we have seen fragmentation in our interactions with customers and our ability to deliver premium service and support" and that, "[i]n hindsight, it is clear we were too focused on building sales capacity and not focused enough on other functions that drive productivity, particularly sales enablement, training, client success and services."  Walrath also disclosed that "we saw a really significant disruption in our business" such as "in Q4, 50% -- over 50% of our in-person events were canceled because of the Omicron surges[,]" while opining that Yext could "[a]bsolutely" improve its "sales motion so that it's more efficient during disruptions like that[.]"

7.     Following that call, a Truist Securities ("Truist") analyst lowered the firm's rating on Yext to hold from buy and slashed its price target to $6 from $17, noting, among other things, that key performing indicators showed an "unexpected slowdown" in Q4, guidance for fiscal 2023 shows no near-term turn around, and that "planned changes under new management (in go-to-market strategy, sales organization) carry execution risks and the timing for a meaningful and sustainable revival in growth is unclear[.]"

8.      Following these disclosures, Yext's stock price fell $0.55 per share, or 9.29%, to close at $5.37 per share on March 9, 2022.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

12.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).   Yext is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

13.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.      Plaintiff, as set forth in the attached Certification, acquired Yext's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.     Defendant Yext is a Delaware corporation with principal executive offices located at 61 Ninth Avenue, New York, New York 10011.  The Company's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the trading symbol "YEXT".

16.     Defendant Howard Lerman ("Lerman") served as Yext's CEO at all relevant times.

17.     Defendant Steven Cakebread ("Cakebread") served as Yext's CFO at all relevant times.

18.     Defendants Lerman and Cakebread are sometimes referred to herein as the "Individual Defendants."

19.     The Individual Defendants possessed the power and authority to control the contents of Yext's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Yext's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Yext, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

20.     Yext and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

21.     Yext organizes a business's facts to provide answers to consumer questions online. The Company operates Yext platform, a cloud-based platform that allows its customers to, among other things, provide answers to consumer questions, control facts about their businesses and the content of their landing pages, and manage their consumer reviews.  Yext's website describes its service as "a modern, AI-powered Answers Platform that understands natural language so that when people ask questions about a business online they get direct answers—not links."

### Materially False and Misleading Statements Issued During the Class Period

22.     The Class Period begins on March 4, 2021, the day after Yext issued a press release during post-market hours announcing the Company's Q4 and FY fiscal 2021 results.  The press release acknowledged the resurgence of COVID-19 but reassured investors that pandemic-related impacts on the Company's business were limited.  Specifically, the press release quoted Defendant Lerman, who stated, in relevant part, that "[d]espite major headwinds caused by lockdowns . . . we drove significant efficiencies in our business" and "overhauled our sales motion" while "successfully generat[ing] demand and clos[ing] deals while working entirely remotely[.]"

23.     On March 16, 2021, Yext filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for its 4Q and FY ended January 31, 2021 (the "2021 10-K").  That filing stated, *inter alia*:

> We continue to expand our relationships with existing customers. For example, some businesses may initially purchase our platform only for their stores in a particular country with opportunities to expand to other stores in the geographic region. We continue to sell additional features, such as Pages, Reviews and Answers, to existing customers.

* * *

6

> We sell our platform throughout the world to customers of all sizes, including our enterprise, mid-size, and third-party reseller customers . . . . We are also developing programs comprised of technology companies and consultants to promote the Yext platform to their customers.
>
> Our sales organization varies by market within each country and will change over time as we build critical mass and address various verticals within a market.

24.     Appended as exhibits to the 2021 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified that the 2021 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [2021 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

25.     On May 27, 2021, Yext issued a press release announcing the Company's Q1 fiscal 2022 results.  That press release quoted Defendant Lerman, who stated, in relevant part, that "[w]e are kicking off this year with a very strong first quarter" and "continue to grow revenue while increasing our business efficiencies and cash position."  Defendant Lerman also represented that "[o]ur team is energized, and we're in a great position as the world begins to reopen."

26.     On June 4, 2021, Yext filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for its Q1 ended April 30, 2021 (the "Q1 2022 10-Q").  That filing purported to advise of COVID-19 related headwinds to the Company's sales, while downplaying the true extent and severity of pandemic-related disruptions, stating, in relevant part:

> The COVID-19 pandemic has disrupted business operations for us and our customers, as well as suppliers, and other parties with whom we do business. Such disruptions are expected to continue for an indefinite period of time.
>
> We have adopted several measures in response to the COVID-19 pandemic and continue to monitor regional developments to inform our operational decisions . . . . [I]n-person marketing events have been canceled or replaced with virtual events. The uncertain duration of these measures have had and may continue to have

negative effects on our sales efforts and revenue growth rates. We continue to be committed to our business, the strength of our platform, our ability to continue to execute on our strategy, and our efforts to support our customers, such as our #Back2Biz campaign which for a period of time offers certain businesses promotional pricing to our platform as businesses begin to re-open.

We may continue to see some existing and potential customers, in particular customers in industries that have been highly impacted by the pandemic such as retail and food services, as well as certain geographies such as Europe, reduce, suspend or delay technology spending; request to renegotiate contracts to obtain concessions such as, extended billing and payment terms; shorten the duration of contracts; or elect not to renew their subscriptions which could materially adversely impact our business, financial condition and results of operations in future periods. The ultimate extent of the impact of the pandemic will depend on future developments, which continue to be highly uncertain and cannot be predicted, including the severity and duration of the COVID-19 pandemic and the actions taken to contain and address its impact, among others. However, because we generally recognize revenue from our customer contracts ratably over the term of the contract, changes in our contracting activity in the near term may not be fully reflected in our results of operations and overall financial performance until future periods.

27.     Appended as exhibits to the Q1 2022 10-Q were substantively the same SOX certifications as referenced in ¶ 24, *supra*, signed by the Individual Defendants.

28.     On September 2, 2021, Yext issued a press release announcing the Company's second quarter ("Q2") fiscal 2022 results.  That press release quoted Defendant Lerman, who stated, in relevant part, that "[w]e had a solid [Q2], driven by new customers and upsells[.]"

29.     On September 3, 2021, Yext filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for its Q2 ended July 31, 2021 (the "Q2 2022 10-Q").  That filing contained substantively the same statements as referenced in ¶ 26, *supra*, purporting to advise of COVID-19 related headwinds to Yext's sales, while downplaying the true extent and severity of pandemic-related disruptions, and additionally assuring investors that "we continue to hold virtual events" and "we have also resumed in-person marketing events."

30.     Appended as exhibits to the Q2 2022 10-Q were substantively the same SOX certifications as referenced in ¶ 24, *supra*, signed by the Individual Defendants.

31.     On December 2, 2021, Yext issued a press release announcing the Company's third quarter ("Q3") fiscal 2022 results.  That press release quoted Defendant Lerman, who represented:

> We are on the road to recovery . . . . The solid results we delivered in [Q3] reflect strong execution against our growth plans. Answers is growing quickly, our Listings business is recovering, and our land-and-expand sales strategy is working. That, coupled with new growth vectors yet to tap, make us optimistic about the future.

32.     On December 3, 2021, Yext filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for its Q3 ended October 31, 2021 (the "Q3 2022 10-Q").  That filing contained substantively the same statements as referenced in ¶ 26, *supra*, purporting to advise of COVID-19 related headwinds to Yext's sales, while downplaying the true extent and severity of pandemic-related disruptions, and continuing to assure investors that "we continue to hold virtual events" and "have . . . resumed in-person marketing events."

33.     Appended as exhibits to the Q3 2022 10-Q were substantively the same SOX certifications as referenced in ¶ 24, *supra*, signed by the Individual Defendants.

34.     The statements referenced in ¶¶ 22-33 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Yext's revenue and earnings were significantly deteriorating because of, *inter alia*, poor sales execution and performance, as well as COVID-19 related disruptions; (ii) accordingly, Yext was unlikely to meet consensus estimates for its FY  fiscal 2022 financial results and fiscal 2023 outlook; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

35.     On March 8, 2022, Yext issued a press release announcing its Q4 and FY fiscal 2022 results.  Among other items, Yext reported revenue of $100.9 million for the quarter, falling short of consensus estimates by $140,000; Q1 fiscal 2023 revenue outlook of $96.3 million to $97.3 million, versus consensus estimates of $103.79 million; Q1 fiscal 2023 non-GAAP net loss per share outlook of $0.08 to $0.07, versus consensus estimates of $0.05; FY fiscal 2023 revenue outlook of $403.3 million to $407.3 million, versus consensus estimates of $444.71 million; and FY fiscal 2023 non-GAAP net loss per share outlook of $0.19 to $0.17, versus consensus estimates of $0.09.

36.     That same day, Yext filed a current report on Form 8-K with the SEC, disclosing the departure of the Individual Defendants—*i.e.*, the Company's CEO and CFO—stating, in relevant part:

> On March 7, 2022, [Defendant] Lerman notified the Company's board of directors (the "Board") of his intention to step down from his position as [CEO] of the Company effective March 25, 2022. [Defendant] Lerman will also resign from the Board and will be transitioning to a new role as an advisor to the Company effective March 25, 2022.
>
> * * *
>
> On March 7, 2022, [Defendant] Cakebread notified the Board of his intention to step down from his position as [CFO] of the Company effective March 25, 2022.

37.     Also on March 8, 2022, Yext hosted a conference call with investors and analysts to discuss the Company's Q4 and FY fiscal 2022 results.  On that call, Yext's incoming CEO, Walrath, addressed the Company's disappointing financial results, revealing, *inter alia*:

> [W]e were disappointed by our performance in fiscal year '22. While it has been a very challenging operating environment and COVID surges in Q2 and Q4 had particular impact, we can now see that our go-to-market was far too inefficient. We did not experience the sustained recovery in sales productivity that we expected last year and it showed in our bookings results which impact revenue in fiscal year '23.

. . . . [W]e have seen fragmentation in our interactions with customers and our ability to deliver premium service and support. This impacts customer satisfaction and challenges our retention and upsell motions. In hindsight, it is clear we were too focused on building sales capacity and not focused enough on other functions that drive productivity, particularly sales enablement, training, client success and services.

38.     On the same call, in response to a question from Truist analyst Naved Khan ("Khan"), Walrath also disclosed that COVID-19 had a more significant impact on Yext's business than previously understood, while opining that the Company could have handled pandemic-related disruptions more efficiently.  Specifically, Walrath stated, in relevant part:

[W]e saw a really significant disruption in our business. I think -- it's worth noting that for -- as an example, in Q4, 50% -- over 50% of our in-person events were canceled because of the Omicron surges. And that's unfortunately an important part of our sales motion. So can we get better at designing our sales motion so that it's more efficient during disruptions like that? Absolutely, we can. But it's also -- it's a fact that those things are disruptive to us.

39.     Following that call, Khan lowered Truist's rating on Yext to hold from buy and slashed its price target to $6 from $17, noting, among other things, that key performing indicators showed an "unexpected slowdown" in Q4, guidance for fiscal 2023 shows no near-term turn around, and that "planned changes under new management (in go-to-market strategy, sales organization) carry execution risks and the timing for a meaningful and sustainable revival in growth is unclear[.]"

40.     Following these disclosures, Yext's stock price fell $0.55 per share, or 9.29%, to close at $5.37 per share on March 9, 2022.

41.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## <u>PLAINTIFF'S CLASS ACTION ALLEGATIONS</u>

42.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Yext securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

43.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Yext securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Yext or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

44.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

45.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

46.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Yext;

- whether the Individual Defendants caused Yext to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Yext securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

47.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

48.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Yext securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Yext securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

49.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

50.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

51.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

52.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

53.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Yext securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Yext securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

54.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Yext securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Yext's finances and business prospects.

55.     By virtue of their positions at Yext, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

56.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Yext, the Individual Defendants had knowledge of the details of Yext's internal affairs.

57.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Yext.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Yext's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Yext securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Yext's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Yext securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

58.     During the Class Period, Yext securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Yext securities at prices artificially inflated by Defendants' wrongful conduct.   Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were

paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Yext securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Yext securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

59.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

60.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

61.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

62.     During the Class Period, the Individual Defendants participated in the operation and management of Yext, and conducted and participated, directly and indirectly, in the conduct of Yext's business affairs.  Because of their senior positions, they knew the adverse non-public information about Yext's misstatement of income and expenses and false financial statements.

63.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Yext's

financial condition and results of operations, and to correct promptly any public statements issued by Yext which had become materially false or misleading.

64.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Yext disseminated in the marketplace during the Class Period concerning Yext's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Yext to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Yext within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Yext securities.

65.     Each of the Individual Defendants, therefore, acted as a controlling person of Yext. By reason of their senior management positions and/or being directors of Yext, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Yext to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Yext and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

66.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Yext.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  June 17, 2022                              Respectfully submitted,

                                                   POMERANTZ LLP

                                                   */s/ Jeremy A. Lieberman*
                                                   Jeremy A. Lieberman
                                                   J. Alexander Hood II
                                                   James M. LoPiano
                                                   600 Third Avenue, 20th Floor
                                                   New York, New York 10016
                                                   Telephone: (212) 661-1100
                                                   Facsimile: (212) 661-8665
                                                   jalieberman@pomlaw.com
                                                   ahood@pomlaw.com
                                                   jlopiano@pomlaw.com

                                                   *Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.     I, _____Marc Menzione_____, make this declaration

pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section

21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private

Securities Litigation Reform Act of 1995.

2.     I have reviewed a Complaint against Yext, Inc. ("Yext" or the "Company") and

authorize the filing of a comparable complaint on my behalf.

3.     I did not purchase or acquire Yext securities at the direction of plaintiffs' counsel

or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.     I am willing to serve as a representative party on behalf of a Class of investors who

purchased or otherwise acquired Yext securities during the class period, including providing

testimony at deposition and trial, if necessary.  I understand that the Court has the authority to

select the most adequate lead plaintiff in this action.

5.     The attached sheet lists all of my transactions in Yext securities during the Class

Period as specified in the Complaint.

6.     During the three-year period preceding the date on which this Certification is

signed, I have not served or sought to serve as a representative party on behalf of a class under the

federal securities laws.

7.     I agree not to accept any payment for serving as a representative party on behalf of

the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such

reasonable costs and expenses directly relating to the representation of the class as ordered or

approved by the Court.

DocuSign Envelope ID: 30D22B26-540A-4888-B7E5-0AD7503431FC

8.   I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed ___4/1/2022_____
          **(Date)**

DocuSigned by:

_Marc Menzione_____
**(Signature)** SD05EAC37181F487...

___Marc Menzione_____
**(Type or Print Name)**

**Yext, Inc. (YEXT)**                                                              **Menzione, Marc**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 3/29/2021 | 2 | $13.9350 |
| Purchase | 4/5/2021 | 10 | $14.7600 |
| Purchase | 4/19/2021 | 83 | $14.3900 |
| Purchase | 4/20/2021 | 1 | $13.8800 |
| Purchase | 5/4/2021 | 30 | $12.8782 |
| Purchase | 8/4/2021 | 4 | $12.6500 |
| Purchase | 1/7/2022 | 2 | $9.0867 |
| Purchase | 2/15/2022 | 11 | $8.1761 |